Dear R. Dean Kenderdine
On behalf of the Board of Trustees for the State Retirement Pension System ("SRPS" or "System"), you have requested our opinion regarding the relation between the Trustees' fiduciary duties and a 2008 law passed by the General Assembly concerning a possible divestiture by the System of investments in companies that do business in Iran or Sudan ("Divestiture Law"). Specifically, you ask the following questions:
(1) To what extent do the provisions of the Divestiture Law conflict with the fiduciary responsibilities of the Trustees and other System fiduciaries?
(2) What, if any, liability would the Trustees and other System fiduciaries have if compliance with the Divestiture Law impedes investment performance? To what extent do the immunity provisions of the Divestiture Law, the indemnification provisions of the State Pension Law, and the general immunities enjoyed by State officials and employees protect the System's fiduciaries if they act in good faith in carrying out the Divestiture Law?
For the reasons given below, it is our opinion that:
(1) The Divestiture Law does not conflict with the fiduciary duties of the Trustees and other System fiduciaries. In particular, that law specifically provides that it does not require the Board of Trustees to take divestment action unless the Board determines, in good faith, that such action is consistent with its other fiduciary duties. *Page 169 
Moreover, it is our view that divestment of interests in companies doing business in Iran or Sudan can be accomplished consistent with the System's other longstanding fiduciary responsibilities if:
 • The System receives fair market value for the interests divested.
 • The costs of divestment are de minimis as compared to total fund assets.
 • Substitute investments are available that will yield competitive returns at a comparable level of risk.
 • The fiduciaries exercise their discretion regarding the timing and manner of divestment so that they are able to avoid imprudent transactions.
 • The fiduciaries otherwise act in accordance with the duties of loyalty and prudence — i.e., ascertain relevant facts, investigate alternatives, obtain appropriate expert analysis, diversify appropriately, and act for the benefit of the beneficiaries.
Finally, we note that, because the Divestiture Law is one of the laws governing the System, the Trustees have fiduciary duty to implement that law.
(2) The Divestiture Law itself provides that the fiduciaries of the System are not liable for actions taken or decisions made in good faith to carry out the Divestiture Law. That immunity would cover claims related to investment performance. In addition, in the absence of a finding of gross negligence or willful misconduct, the State Pension Law provides for indemnification of attorney's fees, judgments, fines, and other expenses reasonably incurred by a System fiduciary with respect to any investigation or proceeding related to the individual's service on behalf of the System. The *Page 170 
indemnification provisions would cover actions taken by System fiduciaries in good faith to carry out the Divestiture Law.
 I Background
A. Statutory Provisions
The current version of the Divestiture Law was enacted by the General Assembly during its 2008 session as Senate Bill 214. Chapter 342, Laws of Maryland 2008. It is codified at Annotated Code of Maryland, State Personnel Pensions Article ("SPP"), § 21-123.1 and becomes effective on January 1, 2009. Id., § 5. The Divestiture Law sets forth a divestment process, qualifies that process by reference to federal law and the Board's fiduciary duties, and provides immunity for actions taken under the statute in good faith.[1]
 Divestment Process
The Divestiture Law creates a process under which the Board of Trustees is to review investments in companies doing business in Iran or Sudan and possibly to divest those interests. To begin the process, the Board is to review its investment holdings in "eligible accounts"[2]
to determine the extent of funds invested in companies that do business in Iran or Sudan. SPP § 21-123.1(b).
This review is not focused on all business relationships that companies may have within Iran or Sudan. Rather, the statute is *Page 171 
limited to specific types of business relationships and is defined differently with respect to the two countries. "Doing business in Iran" means that a company has:
 with actual knowledge, on or after August 5, 1996, made an investment of $20,000,000 or more, or any combination of investments of at least $10,000,000 each, which in the aggregate equals or exceeds $20,000,000 in any 12-month period, and which directly or significantly contributes to the enhancement of Iran's ability to develop the petroleum or natural gas resources of Iran.
SPP § 21-123.1(a)(5).[3] Thus, the Board's review with respect to Iran is to focus on business relationships involving substantial investments over the last 12 years that relate to development of the country's petroleum and natural gas resources.
"Doing business in Sudan" means:
 engaging in commerce in Sudan by maintaining or leasing equipment, facilities, personnel, or other apparatus of business or commerce in oil-related activities, mineral extraction activities, power production activities, or production of military equipment of Sudan. *Page 172 
SPP § 21-123.1(a)(6).[4] Thus, the Board's review with respect to Sudan is focused on current business presence in the country related to oil, minerals, power production, or military equipment.
The statute sets forth a procedure for the Board to follow if it finds that a company is "doing business" in either country. In particular, within 30 days of the B oard's review and "consistent with [its] fiduciary duties," the Board is to provide the company with written notice and an opportunity to comment. SPP § 21-123.1(c). The notice is to state that the company will be subject to divestment action unless, within 90 days, the company provides the Board written comments that either (1) demonstrate that the company is not doing business in Iran or Sudan, or (2) state that, within an additional 60 days, the company will produce a plan to cease doing business in Iran or Sudan within one year. SPP § 21-123.1(c)(2).
Depending upon the company's response to the notice, the Board has several options under the statute: (1) take no action if the company demonstrates that it is not doing business in either of those countries (SPP § 21-123.1(c)(3)); (2) monitor the company's plan to cease doing business in Iran or Sudan over the 12 months immediately following receipt of the plan and take no action if the company terminates that business (SPP § 21-123.1(c)(4)); (3) take divestment action (SPP § 21-123.1(c)(4)(iv), (d)).[5] If the Board takes divestment action, the Board must provide the company with written notice of its decision and the reasons for that decision. SPP § 21-123.1(f). *Page 173 
 Relation to Federal Law
The Board is required to act in good faith to carry out any divestment action "in compliance with all applicable State and federal law, including relevant judicial decisions, and the federal Sudan Accountability and Divestment Act of 2007." SPP § 21-123.1(i). The cited federal law authorizes State and local governments to divest assets in companies that conduct business in Sudan.[6] It also prohibits federal government agencies from contracting with such companies. See
Pub.L. 110-174, 121 Stat. 2516 (2007). To a great extent, the Divestiture Law parallels provisions in the federal statute concerning the types of business covered, the parts of Sudan covered, and procedural requirements such as notice and time periods. An uncodified provision of the Divestiture Law halts the divestment process with respect to companies doing business in Sudan if Congress or the President affirmatively declares that conditions in Sudan have improved in certain respects or that mandatory divestment from Sudan conflicts with the foreign policy of the United States. Chapter 342, § 3(b), Laws of Maryland 2008. *Page 174 
There is currently no similar authorization in federal law concerning state divestment of companies doing business in Iran.[7] However, in an uncodified section of the Divestiture Law, the General Assembly provided that the Divestiture Law would no longer apply to companies doing business in Iran if Congress or the President declares that Iran no longer seeks nuclear weapons or supports international terrorism or that the Divestiture Law interferes with American foreign policy. Chapter 342, § 3(a), Laws of Maryland 2008.
Proviso Concerning Board's Fiduciary Obligations
As noted above, the Divestiture Law requires that the Board act "consistent with [its] fiduciary duties" in initiating the divestment process. SPP § 21-123.1(c)(1). The statute further qualifies the Board's obligations under the Divestiture Law with reference to the Trustees' fiduciary responsibilities. It states:
 Nothing in this section shall require the Board of Trustees to take action as described in this section unless the Board of Trustees determines, in good faith, that the action is consistent with the fiduciary responsibilities of the Board of Trustees as described in Subtitle 2 of this title.
SPP § 21.123.1(j).
Immunity Provision
Finally, the statute expressly immunizes the Trustees and other fiduciaries of the System from liability for all actions and decisions taken in good faith under the Divestiture Law:
 The Board of Trustees, or any other fiduciary of the several systems, may not be held liable *Page 175 
for any actions taken or decisions made in good faith for the purpose of complying with or executing the requirements of any divestment provisions under this subtitle.
SPP § 21-123.1(h).
B. Fiduciary Duties under State Law 1. Fiduciaries
By statute, fiduciaries of the SRPS include members of the Board of Trustees, members of the Investment Committee, and any employee of the State Retirement Agency who exercises any discretionary authority or control over (i) the management or administration of the several State retirement systems; or (ii) the management or disposition of the assets of those systems. SPP § 21-201(b).
2. Fiduciary Duties
SPP § 21-203 directs the fiduciaries of the SRPS to discharge their duties "solely in the interest of the participants" and sets forth specific duties derived in large part from the common law of trusts.[8] See Restatement of the Law 3d Trusts §§ 76-84 (2007) ("Restatement"). The fiduciary duties set forth in the State Pension Law are also similar to the duties described in a model law developed by the National Conference of Commissioners on Uniform State Laws known as the Uniform Management of Public Employee Retirement Systems Act ("UMPERSA"). 7A, Pt. III, *Page 176 
U.L.A. 43.[9] While the General Assembly has not adopted UMPERSA in its entirety, it has directed the Board of Trustees to certify that the retirement systems "adhere to the principles incorporated in [UMPERSA] that address the investment and management of funds for a public pension system." Chapter 146, § 2, Laws of Maryland 2005.
Duty of Loyalty
The statute requires SRPS fiduciaries to carry out their duties "for the exclusive purposes of providing benefits to the participants and for reasonable expenses of administering the several systems." SPP § 21-203(1). Compare UMPERSA § 7(1)-(2) (using virtually identical language); Restatement § 78.[10] In the common law of trusts, the duty of loyalty is the "most fundamental duty" owed by the trustees to the beneficiaries of the trust. Bogert Bogert, The Law of Trusts andTrustees § 543 (2d rev. ed. 1993); see Board of Trustees of theEmployees Retirement System of the City of Baltimore v. Mayor and CityCouncil, 317 Md. 72, 109, 562 A.2d 720 (1989), cert. denied sub nom.Lubman v. Mayor and City Council, 493 U.S. 1093 (1990) ("Board ofTrustees")("the general duty of loyalty is well-established in Maryland law").
The duty of loyalty is embodied in the "exclusive benefit rule." It prohibits self-dealing by a trustee and also limits the trustee's consideration of factors other than the best interests of the beneficiaries of the trust. Restatement § 78, comment b; Board ofTrustees, 317 Md. at 109. Ordinarily it prohibits the trustee from investing in a manner that is intended to serve interests other than those of the beneficiaries or the purposes of the settlor of the trust. Restatement § 90, comment c. *Page 177 
 Duty of Prudence
The statute requires SRPS fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing, that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." SPP § 21-203(2); compare UMPERSA § 7(3) (similar language); Restatement §§ 77, 90.[11] It also specifically directs fiduciaries to "diversi[fy] the investments of the several systems so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." SPP § 21-203(3); compare UM PERSA § 8(a)(2); Restatement § 90(b).[12]
 Duty to Follow Laws and Plan Documents
The Trustees and other fiduciaries must also discharge their duties "in accordance with the laws governing the several systems" and "in accordance with the documents and instruments governing the several systems to the extent that the documents and instruments are consistent with this subtitle." SPP § 21-203(4), (5). Compare UMPERSA § 7(6) (fiduciaries to act "in accordance with a good-faith interpretation of the law governing the retirement program and system"); Restatement § 76, 91.[13] As part of their fiduciary duties, the Trustees and other System fiduciaries have a duty to know and follow pertinent State laws and regulations.
C. Fiduciary Duties under Federal Law
Federal tax law provides for certain tax advantages for pension plans that meet specified conditions and operate as "qualified trusts" under the Internal Revenue Code. 26 U.S.C. § 401(a). There is no question that the General Assembly has intended that the State retirement plans that constitute the SRPS be operated as "qualified trusts" under the Internal Revenue Code. See, e.g., Joint Committee on Pensions ("JCP") Report of the 1989 Interim, at 111-19; JCP Report of the 1990 Interim at 41; JCP Report of the 1991 Interim at *Page 178 
49-61.[14] There are at least two reasons why a public pension plan is maintained as a qualified trust:
 (1) Deferral of taxation on the employer's contribution to the plan on behalf of members ("pick-up" contributions).
 (2) Deferral of taxation on the investment income from the plan's assets.
JCP 1989 Interim Report at 111.
Among the conditions that a plan must satisfy in order to be "qualified" under the Internal Revenue Code is a version of the "exclusive benefit rule":
 (a) A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section-
 * * *
(2) if under the trust instrument it is impossible, at any time prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust, for any part of the corpus or income to *Page 179 
be (within the taxable year or thereafter) used for, or diverted to, purposes other than for the exclusive benefit of his employees or their beneficiaries . . .
26 U.S.C. § 401(a)(2). This rule reinforces common law trust principles.See Cole Hutchinson, Legal Standards Governing Investment of PensionAssets for Social and Political Goals, 128 U. Pa. L.Rev. 1340, 1347 (1980). Therefore, under the Internal Revenue Code, a pension system operates as a qualified trust, with the attendant tax advantages, only if its funds are used exclusively for the benefit of the employees and their beneficiaries.
 II Relation of Divestment Law to Fiduciary Duties
You first asked whether the Divestiture Law conflicts with the fiduciary duties of the Trustees and other System fiduciaries.
A. Divestment Action to be Consistent with Other FiduciaryDuties
Under the Divestiture Law, the Trustees may only initiate or take divestment action if they determine that such action is "consistent with" their fiduciary responsibilities. SPP § 21-123.1(c)(1) and (j). Accordingly, on its face, the Divestiture Law creates no direct conflict with those fiduciary duties. However, the question remains how the Board of Trustees may carry out the divestment directives, and, at the same time, comply with the duty of prudence, duty of loyalty, the exclusive benefit rule, and other fiduciary duties under State and federal law.
B. Fiduciary Duty to Comply with Laws and Documents Governing theSystem
As noted above, among the Trustees' fiduciary duties is the duty to act "in accordance with the laws governing the several systems." SPP21-203(4). Therefore, compliance with the Divestiture Law, like the other requirements of the State Pension Law, are part of the Trustees' fiduciary duties under State law, and not something to be viewed as separate and apart from those duties. *Page 180 
This is similar to the common law governing trusts. The terms of a trust — which, in the case of SRPS, are set forth in applicable provisions of the State Pension Law — may limit the trustees' investment authority, in either general or specific ways. Restatement § 91, comment a. The commentary in the Restatement elaborates:
 The terms of the trust may limit the trustee's investment authority in various w ays. Authority is sometimes narrowed in a general manner, through restrictions or directions that govern investment objectives, policies, and techniques. Other restrictions are more specific in character. These usually either forbid the retention or acquisition of certain investments or types of investments. . . .
 Unless violative of some public policy, such directions and restrictions are legally permissible and are ordinarily binding on the trustee in managing the trust assets, thus often displacing the normal duty of prudence. The trustee, however, is not under a duty to comply with an investment provision when compliance would be impossible or unlawful. . . .
Id., comment e (citations omitted). While the exclusive benefit rule related to the trustee's duty of loyalty ordinarily limits a trustee in advancing social or political causes in making investment decisions, such considerations "may properly influence the investment decisions . . . to the extent permitted by the terms of the trust. . . ." Restatement § 90, comment c. Therefore, provisions of the State Pension Law that direct the trustees to divest interests in companies doing business in certain countries for social or political reasons "may properly influence" the investment decisions of Trustees.
More broadly, the specific terms of a trust — or a law governing the trust — may in some cases displace the normal duties of prudence and loyalty. However, we do not believe that the Legislature has done so in the Divestiture Law. Indeed, in directing the Trustees to implement the Divestiture Law "consistent with" their fiduciary duties, the Legislature cross-referenced the portion of the State *Page 181 
Pension Law that incorporates the duties of prudence and loyalty. SPP § 21-123.1(j). Moreover, in order to maintain the various retirement systems as "qualified plans" under the Internal Revenue Code, the Trustees must comply with the "exclusive benefit rule" that is part of the duty of loyalty and that is incorporated in the federal tax law.
C. Divestment Action Consistent with the Duties of Prudence andLoyalty Board of Trustees Case
In a leading case concerning socially responsible investing, the Court of Appeals provided guidance on how the fiduciaries of a public pension system may implement a directive to divest holdings of companies doing business in a particular country, consistent with their duties of prudence and loyalty. Board of Trustees of the Employees RetirementSystem of the City of Baltimore v. Mayor and City Council, 317 Md. 72,562 A.2d 720 (1989), cert. denied sub nom. Lubman v. Mayor and CityCouncil, 493 U.S. 1093 (1990). In that case, Baltimore City enacted ordinances that required the City's employee pension systems to divest their holdings in companies doing business in South Africa. The trustees and two employee beneficiaries brought suit, challenging the City ordinances on a variety of grounds, including a contention that the ordinances impaired the City's contract with the pension beneficiaries.[15] As part of that argument, the plaintiffs contended that the divestment ordinances affected the trustees' common law duties of prudence and *Page 182 
loyalty that were incorporated in the pension contracts. 317 Md. at 102. The Court agreed that the pension contracts incorporated those common law duties and assumed that, if the legislation had substantially altered those duties, there could be an unconstitutional impairment of contract rights. Id.
With respect to the duty of prudence, the plaintiffs argued that the ordinances altered that duty by radically reducing the universe of eligible investments. 317 Md. at 103. However, the Court found that, even though "the Ordinances do exclude a not insignificant segment of the investment universe," the City had demonstrated that "economically competitive, substitute investments remained available," that the trustees would be able to construct "an almost perfectly diversified portfolio," and that divestiture would not imprudently increase risk or decrease income. Id. at 103-04. In addition, the Court noted that the process for divestiture set forth in the ordinances allowed the trustees to act prudently. In particular, there were procedural safeguards in the ordinances that permitted gradual divestment over a two-year period, and suspension of the divestiture program for up to 90 days at any time if the trustees believed that divestiture had become imprudent.Id. at 105.
The plaintiffs also contended that the ordinances altered the duty of prudence by mandating the consideration of social factors unrelated to investment performance. The Court rejected the argument that consideration of social factors is antithetical to the duty of prudence. It stated that "a trustee's duty is not necessarily to maximize return on investments but rather to secure a `just' or `reasonable' return while avoiding undue risk . . . [I]f, as in this case, social investment yields economically competitive returns at a comparable level of risk, the investment should not be deemed imprudent." 317 Md. at 107. The Court went on to observe:
 [G]iven the vast power that pension trust funds exert in American society, it would be unwise to bar trustees from considering the social consequences of investment decisions in any case in which it would cost even a penny more to do so. Consequently, we conclude that if, as in this case, the cost of investing in accordance with social *Page 183 
considerations is de minimis, the duty of prudence is not violated.
317 Md. at 108 (footnotes omitted).[16] In assessing whether costs arede minimis, the court looked to those costs in comparison to the systems' total assets. Id. at 108 n. 36.
Finally, with respect to the duty of loyalty, the plaintiffs contended that the ordinances altered that duty — i.e., the duty to act for the exclusive purpose of benefitting the members of the retirement system. The Court first recognized that the duty of loyalty not only prohibits self-dealing or conflicts of interest, but also bars a trustee from acting in the interest of a third party at the expense of beneficiaries of the trust. 317 Md. at 109. However, it concluded that "we do not believe that a trustee necessarily violates the duty of loyalty by considering the social consequences of investment decisions. If, as in this case, the costs of considering such consequences are deminimis, the trustee ordinarily will not have transgressed that duty."Id at 109-10.
The Board of Trustees decision thus holds that consideration of social factors in divestment can be consistent with the duties of prudence and loyalty if the following conditions are present:
 (a) The costs of divestment are de minimis as compared to total fund assets. *Page 184 
 (b) Substitute investments are available which will yield competitive returns at a comparable level of risk.
 (c) The fiduciaries have discretion regarding the timing and manner of divestment so that they are able to avoid imprudent transactions.
 (d) The fiduciaries otherwise act in accordance with the duties of loyalty and prudence — i.e., ascertain relevant facts, investigate options, obtain appropriate expert analysis, diversify appropriately, and act for the benefit of the beneficiaries.
 UMPERSA
UMPERSA similarly permits a trustee to consider what it refers to as "collateral benefits" in making investment decisions if certain conditions are met. It states that a trustee "may consider benefits created by an investment in addition to investment return only if the trustee determines that the investment providing these collateral benefits would be prudent even without the collateral benefits."Id., § 8(a)(5). The drafters of UMPERSA explain this provision in part:
 Subsection (a)(5) deals with the issue of collateral benefits. Collateral benefits refer to benefits other than investment return. Investments raising collateral benefits issues come in a variety of forms, including investments that involve moral or political issues (such as investments in South Africa or Northern Ireland), investments targeted to improve the general economic well-being of a State or region, and investments intended to protect or enhance the job prospects of pension plan participants. Retirement systems subject to this Act invest significant sums in investments that produce collateral benefits *Page 185 
and, undoubtedly, refrain from investing another significant (but undeterminable) amount in investments that are disfavored.
 * * * * . . . Arrangements designed to bring areas of investment opportunity which provide collateral benefits to the attention of the trustee will not by themselves constitute a fiduciary violation, so long as the arrangements do not restrict the exercise of the trustee's investment discretion. Similarly, the trustee does not violate any fiduciary responsibilities by making a decision based on collateral benefits if the investment is justified even absent the collateral benefits. Thus, . . . an investment would be appropriate under this subsection if it is expected to provide an investment return commensurate with available alternative investments having similar risks. On the other hand, an investment will not be prudent if it is expected to produce a lower expected rate of return than available alternative investments with commensurate risk, or if it is riskier than available alternative investments with commensurate rates of return.
 A number of States currently have statutes that relate to investments producing collateral benefits. The Drafting Committee suggests that these statutes be repealed when this Act is enacted. To the extent they are not repealed, they must be read in conjunction with subsection (a)(5). To the extent the statutes are not mandatory, the trustee must exercise the discretion permitted by the statutes within the constraints of subsection (a)(5). To the extent the statutes are mandatory, the trustees must comply with them and subsection (a)(5) *Page 186 would apply only in other areas where the trustee retains investment discretion.
UMPERSA, § 8 comment (emphasis added and citations omitted).[17] Thus, pursuant to UMPERSA, when trustees have discretion under the law governing the trust, trustees may divest assets for social or political purposes if the substitute investments yield competitive returns at a comparable level of risk.
D. Divestment Action Consistent with the Exclusive Benefitule underFederal Law
As noted above, the SRPS is to operate the various retirement plans as "qualified plans" under the Internal Revenue Code. As a *Page 187 
result, the System must comply with the "exclusive benefit rule" set forth in 26 U.S.C. § 401(a).
The Internal Revenue Service has provided little guidance as to the meaning of this provision of the tax code. In particular, the IRS has given no specific guidance through regulation or ruling on whether divestment laws applicable to public pension plans violate the "exclusive benefit" requirement of the tax code. The focus of the IRS in this regard has been with respect to private plans, to ensure that the trust funds are not diverted to the employer's purposes (rather than the employees'). See 26 CFR § 1.401-1(b)(5)(ii).
In a somewhat different context, the IRS established a four-part test to determine if an investment of plan assets in employer obligations meets the exclusive benefit rule. In a revenue ruling, it identified four prerequisites for satisfying the exclusive benefit rule:
 • The cost must not exceed fair market value at time of purchase.
 • A fair return commensurate with the prevailing rate must be provided.
 • Sufficient liquidity must be maintained to permit distributions in accordance with the terms of the plan.
 • The safeguards and diversity that a prudent investor would adhere to must be present.
Revenue Ruling 69-494, 1969-2 C.B. 88.
The provisions of the Divestiture Law may be implemented consistent with these principles. That law specifically provides that "the Board of Trustees may exclude from the provisions of subsections (c) and (d) [regarding divestment], a company . . . whose divestment cannot be executed for fair market value or greater." SPP § 21-123.1(e)(2). The requirements of a "fair return," "sufficient liquidity," and diversification are similar to the criteria in *Page 188 
the Board of Trustees opinion that there be available alternative investments with competitive returns at comparable risk. The Divestiture Law is sufficiently flexible to permit the Board to satisfy these criteria. The Board is given sufficient discretion to adjust the timing and nature of any divestment action so it is not required to act imprudently.
E. Summary
The Divestiture Law is one of the statutes governing the System and the Trustees and other System fiduciaries have a fiduciary obligation to implement that law. The law itself directs the Trustees and other System fiduciaries to carry out divestment "consistent with" their other fiduciary obligations — presumably referring primarily to the duties of loyalty and prudence. Indeed, they are not required to take divestment action unless they find that action to be consistent with those fiduciary duties. Accordingly, there is no conflict between the Divestiture Law and the fiduciary duties of the System fiduciaries. Moreover, the System fiduciaries may take divestment action under the statute consistent with those fiduciary obligations if they adhere to the principles set forth in the Board of Trustees decision for socially responsible investing and the IRS guidance for compliance with the exclusive benefit rule by "qualified plans."
 III Liability and Indemnification
You have also asked to what extent the Trustees and other System fiduciaries are protected from liability related to divestment actions by various immunity and indemnification provisions in the law. You are particularly concerned with the potential for liability if a divestment action results in inferior investment performance — presumably judged in hindsight.
A. Liability
Under the State Pension Law, a fiduciary may be held personally liable to the retirement systems for losses resulting from a breach of fiduciary duties, subject to indemnification by the State in certain circumstances. SPP §§ 21-206, 21-207. The Legislature *Page 189 
augmented the protection of fiduciaries in the Divestiture Law by granting SRPS fiduciaries immunity from liability for actions and decisions made in good faith to comply with the Divestiture Law. As noted above, the statute provides that the fiduciaries "may not be held liable for any actions taken or decisions made in good faith for the purpose of complying with or executing the requirements of any divestment provisions. . . ." SPP § 21-123.1(h). Thus, even if there is an allegation that a Trustee or other fiduciary violated one or the other of their fiduciary duties in carrying out the Divestiture Law, this provision absolves them of liability if they acted in good faith.
Other immunities, not directly related to the Divestiture Law, would also protect Trustees and other System fiduciaries from liability for actions taken in good faith in their official capacities. See 93Opinions of the Attorney General 68, 73, 78 (2008) (describing qualified immunity under the Maryland Tort Claims Act and public official immunity as to claims under 28 U.S.C. § 1983).[18]
With respect to your particular concern about inferior investment performance, if the Trustees follow the principles of the Board ofTrustees decision in good faith, they will take divestment action only when, at the time the divestment decision is made, the alternative investments are judged to have comparable returns and risk. If, in hindsight, it turns out that the alternative investments produced a smaller return than the divested investments, they will be immune from liability for claims related to that result.
B. Indemnification
The State Pension Law provides broad indemnification by the State for a "fiduciary who is, or is threatened to be made, a party to an action or proceeding, including an administrative or investigative proceeding, by reason of the fiduciary's service as a fiduciary." SPP § 21-207(a). So long as the fiduciary acted in good faith and "in a manner the fiduciary reasonably believed to be in or not opposed to the best interest of the several systems," the fiduciary is entitled to indemnification with respect to the expenses of any civil or administrative proceeding or investigation. SPP § 21-207(b)(2). A fiduciary would be entitled to indemnification of expenses in *Page 190 
connection with a criminal proceeding with the same conditions so long as the fiduciary "did not have reasonable cause to believe that the fiduciary's conduct was unlawful." SPP § 21-207(b)(3). In either case, the State would pay attorney's fees, judgments, fines, and other expenses "actually and reasonably incurred" in connection with a proceeding. SPP § 21-207(b)(1). Indemnification would not be available if the fiduciary were found liable for gross negligence or willful misconduct in the performance of the fiduciary's duty to the System. SPP § 21-207(d)(1). Finally, the statute also relieves the fiduciaries from paying amounts related to any liability that the State is obligated to indemnify, even if the State fails to secure insurance coverage or otherwise pay the liability itself. SPP § 21-207(e).
Thus, in the absence of a finding of gross negligence or willful misconduct, the members of the Board and other System fiduciaries may be indemnified with respect to personal liability and legal expenses incurred defending any type of civil, criminal or administrative proceeding that might be brought against them related to the Divestiture Law.[19]
 IV Conclusion
For the reasons set forth above, it is our opinion that:
(1) The Divestiture Law does not conflict with the fiduciary duties of the Trustees and other System fiduciaries. Because it is one of the laws governing the System, the Trustees have a fiduciary duty to implement that law. Moreover, that law specifically provides that it does not require the Board of Trustees to take divestment *Page 191 
action unless the Board determines, in good faith, that such action is consistent with its other fiduciary duties.
Moreover, it is our view that divestment of interests in companies doing business in Iran or Sudan can be accomplished consistent with the System's other longstanding fiduciary responsibilities if:
 • System receives fair market value for the interests divested.
 • The costs of divestment are de minimis as compared to total fund assets.
 • Substitute investments are available that will yield competitive returns at a comparable level of risk.
 • The fiduciaries exercise their discretion regarding the timing and manner of divestment so that they are able to avoid imprudent transactions.
 • The fiduciaries otherwise act in accordance with the duties of loyalty and prudence — i.e., ascertain relevant facts, investigate alternatives, obtain appropriate expert analysis, diversify appropriately, and act for the benefit of the beneficiaries.
Finally, we note that, because the Divestiture Law is one of the laws governing the System, the Trustees have fiduciary duty to implement that law.
(2) The Divestiture Law itself provides that the fiduciaries of the System are not liable for actions taken or decisions made in good faith to carry out the Divestiture Law. That immunity would cover claims related to investment performance. In addition, in the absence of a finding of gross negligence or willful misconduct, the State Pension Law provides for indemnification of attorney's fees, judgments, fines, and other expenses reasonably incurred by a *Page 192 
System fiduciary with respect to any investigation or proceeding related to the individual's service on behalf of the System. The indemnification provisions would cover actions taken by System fiduciaries in good faith to carry out the Divestiture Law.
 Douglas Gansler Attorney General
 Deborah Bacharach Assistant Attorney General
 Robert N. McDonald Chief Counsel Opinions and Advice
[1] A 2007 law targeted only companies doing business in Sudan. That law required the Board of Trustees to encourage companies that do business in Sudan "to act responsibly and avoid actions that promote or otherwise enable human rights violations . . ." and gave the Board discretion to take divestment action after considering a list of factors. Chapters 39, 40, Laws of Maryland 2007, then codified at SPP § 21-123.1. The 2007 law was repealed as part of the passage of the 2008 Divestiture Law.
[2] "Eligible accounts" means actively managed separate accounts and does not include index funds, private equity funds, and other commingled or passively managed funds. SPP § 21-123.1(a)(2), (7).
[3] This definition appears similar to, and perhaps derived from, similar definitions in proposed federal legislation. See, e.g., Iran Sanctions Enhancement Act of 2007, H.R. 2880 (introduced June 27, 2007); Iran Sanctions Enabling Act, H.R. 2347 (passed by House of Representatives July 31, 2007, and later referred to committee in the Senate).
[4] As to Sudan, the statute applies only to "the government in Khartoum, Sudan that is led by the National Congress Party (formerly known as the National Islamic Front) or any successor government formed on or after October 13, 2006, including the Coalition National Unity Government agreed on in the Comprehensive Peace Agreement for Sudan." SPP § 21-123.1(a)(11)(i). This definition explicitly does not include the regional government of southern Sudan. SPP § 21-123.1(a)(11)(ii). This distinction is similar to one made in the federal Sudan Accountability and Divestment Act of 2007, P.L. 110-174, 121 Stat. 2516
(2007).
[5] "Divestment action" means selling, redeeming, transferring, exchanging, otherwise disposing of, and refraining from further investment in, certain investments. SPP § 21-123.1(a)(4), (d)(2).
[6] This authorization was apparently adopted by Congress to ensure that state efforts to adopt divestiture laws and policies were not invalidated under Crosby v. National Foreign Trade Council, 530 U.S. 363
(2000). Crosby held that a Massachusetts law that barred state entities from contracting with companies doing business in Burma was preempted by a federal statute that delegated decisions on sanctions against Burma to the President and thus was invalid under the Supremacy Clause of the federal constitution. It has been reported that, as of January 2008, 22 states had adopted divestment policies relating to Sudan. Crook, NewU.S. Legislation Authorizes Divestment in Companies Doing Business withSudan, 102 Am. J. Int'l L. 370, 371 (2008). At least one of those laws was struck down prior to the enactment of the 2007 federal statute on grounds of preemption and interference with the constitutional authority of the federal government to control foreign relations. National ForeignTrade Council v. Giannoulias, 523 F. Supp. 2d 731 (N.D. Ill. 2007) (Illinois Sudan Act).
This opinion discusses the relationship between divestment and the fiduciary duties of the Trustees and other System fiduciaries; it does not address issues of federal preemption or control over foreign relations.
[7] The Iran Sanctions Enabling Act of 2007, which has been passed by the House of Representatives and is currently in committee in the Senate, would authorize state and local governments to divest assets in companies that conduct business in Iran and thereby eliminate any issue as to whether such action is preempted by federal law. See note 6 above.
[8] These duties were formally enumerated in statute in 1977. Chapter 871, Laws of Maryland 1977.
The statutory duties applicable to the SRPS fiduciaries are also very similar to the fiduciary duties set forth in the Employees Retirement Income Security Act of 1974 ("ERISA"), § 404(a), 29 U.S.C. § 1104(a), which also were derived from the common law of trusts. Pegram v.Hedrich, 530 U.S. 211, 224-25 (2000). SRPS, like all governmental pension plans, is not subject to ERISA. However, because in certain instances the language is the same or similar to many State statutes, ERISA cases and interpretations can provide useful guidance.
[9] The drafters of UMPERSA concluded that investment standards for public plans "ha[ve] often failed to keep pace with modern investment practices." The goal of UMPERSA was to "modernize, clarify, and make uniform the rules governing the management of public retirement systems." A primary purpose of the model law was to facilitate the incorporation of modern investment practices into state law, specifically, changes in the investment practices of fiduciaries brought about by a widespread acceptance of "modern portfolio theory." Drafting Committee's Introduction to the text of UMPERSA.
[10] See also ERISA, § 404(a)(1), 29 U.S.C. § 1104(a)(1).
[11] See also ERISA, § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).
[12] See also ERISA, § 404(a)(1)(C), 29 U.S.C. § 1104(a)(1)(C).
[13] See also ERISA, § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).
[14] The JCP reports detail the changes to the federal tax code affecting public pension plans, the importance of being a "qualified" pension plan, and recommendations for Maryland legislation that will keep the SRPS plans into compliance with the federal tax code.
Further evidence of the General Assembly's intent for the System to be "qualified" can be seen in the various statutory provisions enacted over the past 15 years to ensure compliance with the federal tax code. See,e.g., SPP §§ 20-207; 20-208; 21-313; 21-601 through 604; 23-303.1(d)(3); and 23-306.2(b)(3). Moreover, the System has periodically, over a span of 35 years, filed requests with the Internal Revenue Service for "Determination Letters" attesting to the "qualified" status of the various plans, and such Determination Letters have been issued.
[15] The plaintiffs also alleged that the ordinances intruded on the federal government's exclusive power to conduct foreign policy and regulate interstate and foreign commerce. The Court of Appeals held that the ordinances had only a minimal and indirect effect on South Africa and therefore did not intrude on the federal government's authority over foreign relations or violate the commerce clause of the federal constitution. These aspects of the Court's decision have been subsequently questioned. See National Foreign Trade Council v.Natsios, 181 F.3d 38, 55-56 (1st Cir. 1999); NationalForeign Trade Council v. Giannoulias, 523 F. Supp. 2d 731, 740-41
(N.D. Ill. 2007); Dhooge, Darfur, State Investment Initiatives and theCommerce Clause, 32 N.C. J. Int'l Com. Reg. 391, 442-48 (2007). However, the Court's holdings concerning the relationship of social considerations to the trustees' duties of prudence and loyalty have not been questioned in a published opinion.
[16] In reaching this conclusion, the Court relied, in part, on a leading treatise on trusts that rejected the idea that trustees were bound to obtain a maximum return for a fund regardless of other considerations:
 Trustees in deciding whether to invest in, or to retain, the securities of a corporation may properly consider the social performance of the corporation. They may decline to invest in, or to retain, the securities of corporations whose activities or some of them are contrary to fundamental and generally acceptable ethical principles. They may consider such matters as pollution, race discrimination, fair employment, and consumer responsibility.
317 Md. at 106 (quoting Scott on Trusts § 227.17 (4th ed. 1988)).
[17] In a similar vein, the United States Department of Labor has issued guidance for ERISA plans concerning the exclusive benefit rule and the duty of prudence in relation to "economically targeted investments" — i.e., investments selected for the economic benefits they create apart from their investment return to the employee benefit plan.See Interpretive Bulletin Sec. 2509.08-1, 29 CFR § 2509.08-1, 73 Fed. Reg. 61734 (October 17, 2008), replacing Interpretive Bulletin 2509.94-1 (June 23, 1994). The Department of Labor advised that ERISA fiduciaries could make such investments if they conclude that an economically targeted investment is "truly equal" to alternative investments —i.e., commensurate rates of return and degrees of risk. The Department's guidance explained:
 The Department has recognized . . . that under these limited circumstances, fiduciaries can choose between the investment alternatives on the basis of a factor other than the economic interest of the plan . . . because (1) ERISA requires fiduciaries to invest plan assets and to make choices between investment alternatives; (2) ERISA does not itself specifically provide a basis for making the investment choice in this circumstance; and (3) the economic interests of the plan are fully protected by the fact that the available investment alternatives are, from the plan's perspective, economically indistinguishable.
Id. at 61735.
[18] See also Annotated Code of Maryland, State Government Article, § 12-105, and Courts Judicial Proceedings Article, § 5-522(b).
[19] It is also notable that the Board of Public Works is authorized, subject to certain conditions, to pay a settlement or judgment, as well as counsel fees, against any "State personnel." Annotated Code of Maryland, State Government Article ("SG"), § 12-501. Among the conditions to be satisfied is a finding by the Board of Public Works that the State personnel were acting within the scope of employment, and that the act or omission at issue was not malicious or grossly negligent. SG § 12-405. The members of the Board of Trustees and other System fiduciaries are included within the scope of the definition of "State personnel." SG § 12-401(12) and (13).
 *Page 3